**SIX COS., Inc., v. DE VINNEY, County Assessor.**

**No. G–195.**

District Court, D. Nevada.

Feb. 15, 1933.

Heller, Ehrman, White & McAuliffe, and Thelen & Marrin, all of San Francisco, Cal., for plaintiff.

Gray Mashburn, Atty. Gen., of Nevada, W. T. Mathews, Asst. Atty. Gen., and Harley A. Harmon, Dist. Atty., of Las Vegas, Nev., for defendant.

Richard J. Coffey, Dist. Counsel, Bureau of Reclamation, of Los Angeles, Cal., and H. H. Atkinson, U. S. Atty., of Reno, Nev., amici curiæ.

NORCROSS, District Judge.

Plaintiff by its bill of complaint prays for a decree enjoining defendant from proceeding with the enforcement and collection of taxes upon personal property of plaintiff and the demanding of payment of all poll taxes claimed to be due from its employees. Plaintiff contends it is not liable for such taxes for the reason that the said property is located within and said employees are employed and reside within the Boulder Canyon Project Federal Reservation, on which the state of Nevada is claimed to have ceded jurisdiction. Exemption is also claimed for the further reason urged that plaintiff is an instrumentality of the federal government. See Six Companies v. Stinson (D. C.) 58 F.(2d) 649.

Primarily, it is urged that the state of Nevada is without jurisdiction to enforce its laws over the area in question by reason of the establishment of what is styled the Boulder Canyon Project Federal Reservation, and compliance with the provisions of an act of the Legislature of the State of Nevada, approved February 24, 1921 (St. 1921, c. 23, p. 27) entitled: "An Act ceding the jurisdiction of this state over certain lands owned or to be acquired by the United States and repealing certain acts relating thereto." Nevada Comp. Laws 1929, §§ 2895–2898.

So much of the body of the said act as is material reads:

"Section 1. The consent of the State of Nevada is hereby given, in accordance with the seventeenth clause, eighth section of the first article of the constitution of the United

States, to the acquisition by the United States, by purchase condemnation or otherwise, of any land in this state which has been, or may hereafter be, acquired for sites for customhouses, courthouses, postoffices, arsenals, or other public buildings whatever, or for any other purpose of the government.

"Sec. 2. The exclusive jurisdiction in and over any land so acquired by the United States shall be, and the same is hereby, ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this state, but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands; provided, that an accurate description and plat of such lands so acquired, verified by the oath of some officer of the general government having knowledge of the facts, shall be filed with the governor of this state.

"Sec. 3. The jurisdiction hereby ceded shall not vest until the United States shall have acquired the title to the said lands by purchase, condemnation or otherwise; and so long as the said lands shall remain the property of the United States when acquired as aforesaid, and no longer, the same shall be and continue exempt and exonerated from all state, county and municipal assessment, taxation or other charges which may be levied or imposed under the authority of this state."

The Boulder Canyon Project Act, enacted by Congress and approved December 21, 1928 (45 Stat. 1057 to 1066, 43 USCA §§ 617 to 617t), by its first section (617) provides: "For the purpose of controlling the floods, improving navigation and regulating the flow of the Colorado River, providing * * * for reclamation of public lands and other beneficial uses, * * * and for the generation of electrical energy * * * the Secretary of the Interior, * * * is hereby authorized to construct, operate, and maintain a dam and incidental works in the main stream of the Colorado River at Black Canyon or Boulder Canyon adequate to create a storage reservoir of a capacity of not less than twenty million acre-feet of water and a main canal and appurtenant structures * * * connecting the Laguna Dam, or other suitable diversion dam, * * * with the Imperial and Coachella Valleys in California, * * * and to acquire by proceedings in eminent domain, or otherwise, all lands, rights of way, and other property necessary for said purposes."

By section 617e it is provided: "The title to said dam, reservoir, plant, and incidental works shall forever remain in the United States. * * *"

By section 617m it is provided: "This chapter shall be deemed a supplement to the reclamation law, which said reclamation law shall govern the construction, operation, and management of the works herein authorized, except as otherwise herein provided."

See Arizona v. California et al., 283 U. S. 423, 51 S. Ct. 522, 75 L. Ed. 1154, sustaining the validity of this act.

On May 26, 1931, there was filed with the Governor of the State of Nevada a plat designated, "Department of the Interior Bureau of Reclamation Boulder Canyon Project Federal Reservation in Nevada." Attached thereto was an affidavit made by the Secretary of the Interior of date May 15, 1931, in part reading: "I, Ray Lyman Wilbur, Secretary of the Interior, having knowledge of the facts, do hereby certify that this diagram is a true and accurate representation of the area constituting the Boulder Canyon Project Federal Reservation of the United States in Nevada; that except as to certain lands in private ownership hereinafter referred to, the title to the area shown upon this diagram is in the United States, and that said area so owned by the United States is set apart and reserved by the United States for its use in the construction of the Hoover Dam, the Power Plant and the incidental works authorized by the Boulder Canyon Project Act of December 21, 1928 (45 Stat. 1057); and that said area so owned by the United States is described as follows:"

Here follows a description of the boundaries of the reservation and a reference to certain lands therein held in private ownership comprising six patented mining claims, and the right of way for Los Angeles & Salt Lake (U. P.) Railroad from a point on the west boundary of the reservation to the town of Boulder City and for station grounds at said city.

The boundaries of the said reservation, as delineated on the said plat, may be briefly described as follows: Beginning at a point in the center of the Colorado river approximately six miles southerly of the Hoover Dam site; thence west eleven miles; thence north three miles, twenty chains; thence east two miles; thence north nine miles, 60 chains; thence east twelve miles; thence south approximately one-half mile to the center of Colorado river; thence following the center

of the Colorado river to the point of beginning. The area of the reservation is approximately 115 square miles.

The said plat also shows the course of the Colorado river; the location of the Hoover Dam to be constructed therein; the town site of Boulder City as being approximately seven miles southwesterly from the dam site; the L. A. & S. L. (U. P.) R. R. branch line to Boulder City; state highway paralleling same; United States Construction Railroad and United States highway from Boulder City to the dam site.

The plat was submitted for filing together with a letter from the Secretary of the Interior to the Governor, of date May 19, 1931, the material portions of which read:

"Pursuant to the seventeenth clause of article 1, section 8 of the Constitution of the United States, and to section 2897 of the Nevada Compiled Laws, 1929, there is attached hereto for filing in your office an accurate description and plat or diagram showing lands embraced within the Boulder Canyon Project Federal Reservation in Clark County, Nevada, the establishment of which is hereby declared effective the date on which this letter and its accompanying enclosures are filed in your office. This reservation is established in order to facilitate the construction and operation of the Hoover Dam, power plant, and appurtenant works authorized by the Boulder Canyon Project Act of December 21, 1928 (45 Stat. 1057).

"Within the area described on said plat or diagram exclusive jurisdiction shall be exercised by the United States for all purposes except the service of civil and criminal process of the courts of the State of Nevada, as duly authorized by law."

To the letter of the Secretary, the Governor of Nevada replied by letter, of date of May 26, 1931, the body of which reads:

"This will acknowledge receipt at the hands of Chief Engineer R. F. Walter of the Bureau of Reclamation, of your letter of May 19th, with accompanying map of the Boulder Canyon Project Federal Reservation in Clark County, Nevada, which last has been filed in this office, and transmitted to the Surveyor General of Nevada for recording and filing in that office.

"It is noted that within the area described upon said plat or diagram, exclusive jurisdiction shall be exercised by the United States for all purposes except the service of civil and criminal process of the courts of the State of Nevada, as duly authorized by law."

Defendants introduced in evidence a letter from Governor Balzar to Secretary Wilbur, of date of December 16, 1931, the body of which, in part, reads:

"Reference is hereby made to your letter of May 19, 1931, * * * and, also, to my letter to you of May 26, 1931 * * *.

"I am sure that you will consider my letter to you of that date * * * not as either admitting or acquiescing in either the sufficiency or legality of your said act or acts in attempting to establish what you refer to in your letter as 'Boulder Canyon Project Federal Reservation,' or as any admission or acquiescence upon the part of the State of Nevada, that said Reservation was thereby or at all legally or actually created or established, or that any such reservation now exists or ever has existed. * * *

"It is * * * my understanding that you had not lawful authority to create or establish, in the manner attempted by you in this particular case, any such reservation; and that no such reservation has been established and that none exists. * * *

"The state of Nevada, will continue to exercise, * * * its sovereign powers of jurisdiction over the area in question * * *."

It is here appropriate to say that expressions of opinion contained in the letters passing between the Secretary of the Interior and the Governor are without force as affecting the validity or invalidity of the reservation. If the Secretary had authority to establish such reservation and the same was within the purview of the state statute, then, if the plat and affidavit accompanying the same complied with the provisions of the statute, jurisdiction over the area within the described boundaries vested in the United States upon filing the plat with the Governor. The state statute in question did not vest authority in the Governor to approve or disapprove the proceedings by which the matter of a transfer of jurisdiction was sought to be effected. The opinions of such officers expressed in correspondence between them, while entitled to respectful consideration, manifestly are not binding upon either government.

It is contended upon the part of defendant that jurisdiction over the said reservation was not ceded for the reasons that the land embraced therein, being a part of the public domain, was not acquired either in the manner or for a purpose specified in the statute; that the same is an area set apart for temporary use or convenience in the construction of the dam, plant, and incidental works, and

not a site for a purpose of the government within the meaning of the act; that the Secretary of the Interior was without authority to establish such reservation; and that the description and plat are not accurate.

The state statute of February 24, 1921, has not been construed by the state courts, and this court is, therefore, compelled to place its construction thereon.

The land in question in this case was not originally acquired by purchase, condemnation, or otherwise for the specific purpose or any purpose referred to in the Boulder Canyon Project Act, but is a part of the public domain which had its origin in the Mexican cession of 1848, following the termination of the war with Mexico (9 Stat. 922). Previous to the filing of the plat with the Governor the land embraced therein had been withdrawn from public entry.

The statute in question is a general one, as distinguished from special acts adopted by the Legislatures of various states relinquishing jurisdiction over sites or areas set apart by the national government for particular purposes. With the latter class of statutes there is usually no difficulty in determining the question of relinquishment of jurisdiction. As the act in question is general, in order to accomplish a relinquishment of jurisdiction over a particular site, the purpose of the site must be such as is within the purview of the statute; the land constituting the same must have been acquired for such purpose, and thereafter an accurate description and plat of such land so acquired, duly verified, must be filed with the Governor.

The act, in section 1, provides that "the consent of the state * * * is given in accordance with" certain provisions of the Constitution of the United States. Clause 17, section 8, article 1 of the federal Constitution, referred to in the statute, reads: "Congress shall have Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District * * * as may * * * become the Seat of the Government * * * and to exercise like Authority over all Places purchased by the consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings."

It will be noted that the statute, while providing that the consent of the state is given in accordance with the provisions of the federal Constitution to the acquisition of land within the state, the method of acquisition is less restricted and the purposes for such acquisition are broader than expressed in the terms of the federal Constitution. It is clear, however, not only from the language used in section one of the act, but also that used in sections 2 and 3 thereof, that jurisdiction was not intended to be ceded except in cases where land was acquired for a site for a purpose of the government mentioned in section one of the act.

The first question which suggests itself is: Can a portion of the public domain withdrawn from entry and set aside for a particular governmental purpose be said to have been acquired for such purpose within the meaning of the state statute so as to effect a cession of jurisdiction over the same?

In Fort Leavenworth R. R. Co. v. Lowe, 114 U. S. 525, 530, 5 S. Ct. 995, 998, 29 L. Ed. 264, opinion by Mr. Justice Field, the court said:

"Purchase with such consent was the only mode then thought of for the acquisition by the general government of title to lands in the states. Since the adoption of the constitution this view has not generally prevailed. * * * The consent of the states to the purchase of lands within them for the special purposes named, is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals.

"But not only by direct purchase have the United States been able to acquire lands they needed without the consent of the states, but it has been held that they possess the right of eminent domain within the states. * * *

"Besides these modes of acquisition, the United States possessed, on the adoption of the constitution, an immense domain lying north and west of the Ohio river, * * * and, since the adoption of the constitution, they have, by cession from foreign countries, come into the ownership of a territory still larger, lying between the Mississippi river and the Pacific ocean, and out of these territories several states have been formed and admitted into the Union. The proprietorship of the United States in large tracts of land within these states has remained after their admission. There has been, therefore,

no necessity for them to purchase or to condemn lands within those states, for forts, arsenals, and other public buildings, unless they had disposed of what they afterwards needed. Having the title, they have usually reserved certain portions of their lands from sale or other disposition, for the uses of the government."

It is contended on behalf of plaintiff that the state statute applies to land acquired both before and after its adoption. This contention may readily be conceded. It is also clear, however, that the land must not only be acquired, but whenever acquired it must have been acquired for a purpose of the government within the meaning of the statute. Upon the question of acquisition it is contended by plaintiff that the setting aside of this land out of the public domain and withdrawing the same from public entry "was an acquisition thereof within the meaning of that statute as fully as if the United States had purchased the land from others." The fallacy of this contention lies in the fact that after the land had been withdrawn from entry and set apart for the purposes specified, no change had occurred in ownership. All that was done with the land was in exercise of ownership, consisting of the withdrawal of offers for its acquisition by the public and the setting of the same aside for certain uses or purposes of the government. The United States did not acquire anything it did not already own. Surplus Trading Co. v. Cook, 281 U. S. 647, 50 S. Ct. 455, 74 L. Ed. 1091; Woodruff v. North Bloomfield Gravel Mining Co. (C. C.) 18 F. 753.

The land of which the reservation is a part was withdrawn from public entry April 21, 1923, under the provisions of the Act of Congress of June 17, 1902 (32 Stat. 388 [43 USCA § 416]), as "lands required for any irrigation works," the irrigation works referred to being designated in the order of withdrawal as "Colorado River Storage Project, Boulder Canyon Reservoir site." The act under which the land was so withdrawn further provides that the Secretary of the Interior "shall restore to public entry any of the lands so withdrawn when, in his judgment, such lands are not required for the purposes of this chapter." (43 USCA § 416.) It may here be noted that the greater portion of the land within the reservation is from 1,000 to 3,000 feet elevation and hence without the area which will ultimately be covered by the reservoir. It therefore appears that a portion of the land within the said Boulder Canyon Project Reservation would ultimately have to be restored to public entry.

From the "specifications and schedule of drawings of Hoover Dam power plant and appurtenant works" forming a part of the contract between the United States and plaintiff, which contract is of date of March 11, 1931, it conclusively appears that when the contract is completed, the said dam, power plant, and appurtenant works, so far as they will be situated on the Nevada side of the Colorado river, will be comprehended within an area of approximately one mile in length and not exceeding one-fourth of a mile in width. Assuming that the said dam, power plant, and appurtenant works are within the meaning of the expressions in the state statute, "other public buildings whatever, or for any other purpose of the government," the question is presented whether the filing of a plat which is not only inclusive of such dam, plant, and appurtenant works, but is also inclusive of more than a hundred square miles of adjacent territory, is within the meaning of the provisions of the state statute.

Statutes relinquishing jurisdiction are strictly construed. A controlling reason for such construction is that it is a matter of the very greatest importance to both the national and the state governments affected. Larson v. South Dakota, 278 U. S. 429, 49 S. Ct. 196, 73 L. Ed. 441.

It is clear from the affidavit of the Secretary of the Interior attached to the said plat of the reservation, and from the evidence, oral and documentary, submitted at the trial, that the purpose of the very great portion of the reservation is limited to that of construction of the dam, power plant, and appurtenant works. The affidavit of the Secretary states the only purpose of the reservation to be "for its use in the construction of the Hoover Dam, the power plant and the incidental works authorized by the Boulder Canyon Project Act." The letter of the Secretary to the Governor submitted at the time of filing the plat states: "This Reservation is established in order to facilitate the construction and operation of the Hoover Dam," etc. The contract discloses that the construction work is to be completed within a period of approximately seven years. Plaintiff's brief states it will be completed in approximately six years. The purpose then of all but a very small fraction of the reservation is temporary in character.

In the brief of plaintiff appears the statement: "Certainly if, in his (Secretary of Interior's) judgment, the establishment of a federal reservation over the land adjacent to

the construction work and the exercise by the federal government of exclusive jurisdiction therein, will be of assistance in the orderly performance of the work, he has ample authority in the federal statutes hereinbefore cited to accept the offer of Nevada to cede jurisdiction over such a reservation."

The statutes referred to are the Reclamation Law and the Boulder Canyon Project Act. The latter act, as before pointed out, is supplementary to the Reclamation Law, except as otherwise therein provided.

Taking the language of the brief quoted supra, is the state statute susceptible of a construction as an offer upon the part of the state to cede jurisdiction over a site which for that reason "will be of assistance in the orderly performance of the work" of construction?

All the purposes specifically mentioned in section 1 of the state act refer to public buildings of a character the use of which would either be permanent or for an indefinite period of time, as distinguished from a mere incidental purpose manifestly of short duration. The expression in the statute, "for any other purpose of the government," is governed by the rule ejusdem generis, and likewise refers to a purpose either of indefinite duration or of a permanent character. The Boulder Canyon Project Act clearly discloses that the dam and incidental works therein referred to are of a permanent character, and specifically provides that "the title to said dam, reservoir, plant and incidental works shall forever remain in the United States." It is clear that the state act does not contemplate a ceding of jurisdiction over a site the use of which is not only temporary but incidental to some other purpose. There is no specific provision in the Boulder Canyon Project Act authorizing the Secretary of the Interior to establish any reservation, and if such authority may be inferred it would be limited to the area covered by the expression last above quoted, including any additional area necessary for administrative purposes.

While, "except as otherwise herein provided," the Project Act is deemed a supplement to the Reclamation Law, a reference to the latter law, with one possible exception, discloses nothing which the national government might be said to intend the retention of control of beyond the consummation of the purposes of the law—the reclamation by means of irrigation of portions of the arid domain. This law comprehends the acquisition by citizens of the United States of the land and water rights. The law generally comprehends that its purposes will be carried out under national direction, but, subject thereto, always without relinquishment of state jurisdiction. The only possible exception where there might be any occasion for the relinquishment of state jurisdiction and its assumption by the national government is to be found in the proviso forming a part of section 498 (43 USCA) reading: "That the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress."

Only in the Reclamation Law is there any provision for the establishment of town sites within reclamation projects or under the authority of the Bureau of Reclamation. Sections 561–570 (43 USCA). These provisions of the law clearly indicate the intention of Congress that the towns so established will be and remain subject to local state jurisdiction, and lots therein acquired by individual residents, and parks, playgrounds, community centers, and school grounds acquired by the public.

It is clear that the state statute relinquishing jurisdiction in certain specified instances not only has no application where the land constituting the site is a part of the public domain, but that no power is conferred upon the Secretary of the Interior to set apart an area such as is embraced within the said Boulder Canyon Project Federal Reservation as a basis for claimed compliance with the state relinquishment act. Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294; Twin Falls Canal Co. v. Foote (C. C.) 192 F. 583.

It is further contended upon the part of defendants that the plat of the reservation filed would not be in compliance with the state statute even if the land embraced therein might be said to have been acquired for a governmental purpose and authority existed for its establishment, for the reason that the description and plat is inaccurate, in that it purports to fix the easterly boundary of the reservation as the middle of the Colorado river, which includes an area from the middle of the river to the shore line thereof on the Nevada side, which is an area belonging to the state and not to the United States, citing 14 U. S. Stat. 43; Stats. of Nev. 1867, p. 145; Arizona v. California, supra. As other questions presented and determined are controlling, we need not consider this latter contention.

It is also contended by plaintiff that in performing its contract for the construction of Hoover Dam, power plant, and appurtenant works, it is an instrumentality of the United States, and as such not subject to the Revenue laws of the state of Nevada. A number of cases are cited in support of this contention, none of which, however, deal with the status of a contractor for the construction of public works. Reference is made to the case of Arizona v. California, supra, and the court's disposition of the claim asserted upon behalf of the state of Arizona that quasi sovereign rights would be invaded, among others, in respect to the construction of the dam in pursuance of plans and specifications which had not the written approval of the state engineer of Arizona, as provided by the statute of that state. Dealing with that question, the court said (pages 451, 452 of 283 U. S., 51 S. Ct. 522, 525, 75 L. Ed. 1154):

"The United States has not secured such approval; nor has any application been made by Wilbur, who is proceeding to construct said dam in complete disregard of this law of Arizona.

"The United States may perform its functions without conforming to the police regulations of a state. Johnson v. Maryland, 254 U. S. 51, 41 S. Ct. 16, 65 L. Ed. 126; Hunt v. United States, 278 U. S. 96, 49 S. Ct. 38, 73 L. Ed. 200. If Congress has power to authorize the construction of the dam and reservoir Wilbur is under no obligation to submit the plans and specifications to the state engineer for approval."

This case and the cases therein cited deal with acts of officers or employees in the exercise of governmental functions, and the cases are unanimous in holding that in so acting they are not subject to the revenue or police laws of a state. The case of a corporation contractor for the construction of public works is one in which, if it may be said to be an instrumentality of the government, its relations to the government are nevertheless purely contractual. It does not exercise governmental functions. It undertakes to construct according to plans and specifications adopted by officials of the government. It is organized for that and similar purposes and its primary object is to comply with the conditions of the contract for the profit to be made in so complying. In the case of Clallam County v. United States, 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328, the court held that "the Spruce Production Corporation was organized by the United States as an instrumentality for carrying on the war," and said: "This is not like the case of a corporation having its own purposes as well as those of the United States and interested in profit on its own account."

In Fidelity & Deposit Co. v. Pennsylvania, 240 U. S. 319, 36 S. Ct. 298, 60 L. Ed. 664, the court said: "But mere contracts between private corporations and the United States do not necessarily render the former essential governmental agencies, and confer freedom from state control." (Page 323 of 240 U. S., 36 S. Ct. 298, 300, 60 L. Ed. 664).

In Baltimore Shipbuilding & Dry Dock Co. v. Baltimore, 195 U. S. 375, 25 S. Ct. 50, 49 L. Ed. 242, the court said: "It seems to us extravagant to say that an independent private corporation for gain created by a state, is exempt from state taxation either in its corporate person, or its property, because it is employed by the United States, even if the work for which it is employed is important and takes much of its time." (Page 382 of 195 U. S., 25 S. Ct. 50, 52, 49 L. Ed. 242.)

In Kidd v. Pearson, 128 U. S. 1, 26, 9 S. Ct. 6, 12, 32 L. Ed. 346, the court said: "The police power of a state is as broad and plenary as its taxing power, and property within the state is subject to the operations of the former so long as it is within the regulatory restrictions of the latter."

See, also, Metcalf & Eddy v. Mitchell, 269 U. S. 514, 46 S. Ct. 172, 70 L. Ed. 384.

The authorities cited established the law to be that plaintiff is not such a governmental instrumentality as exempts it and its property from liability for taxes under the revenue laws of the state.

Decree for injunction prayed for is denied, and the bill of complaint is dismissed.