## TEXAS & PACIFIC RY. CO. *v.* UNITED STATES.

No. 634.   Argued April 14, 1932.—Decided May 16, 1932.

*Messrs. John W. Davis* and *Newton K. Fox*, with whom *Messrs. Adrian C. Humphreys* and *Chester A. Gwinn* were on the brief, for petitioner.

*Assistant Attorney General Rugg,* with whom *Solicitor General Thacher,* and *Messrs. Joseph H. Sheppard, Bradley B. Gilman,* and *Erwin N. Griswold* were on the brief, for the United States.

Mr. Justice Roberts delivered the opinion of the Court.

During federal control of railways that of petitioner was operated by the Director General under the act of March 21, 1918.[1] Pursuant to the Transportation Act, 1920,[2] the Government relinquished the property March 1, 1920; petitioner accepted the provisions of § 209[3] of the act, and consequently received for the six months

---

[1] C. 25, 40 Stat. 451.
[2] Act of February 28, 1920, c. 91, 41 Stat. 456.
[3] 41 Stat. 464; U. S. C., Tit. 49, § 77.

288

period commencing March 1, 1920, an allowance awarded by the Interstate Commerce Commission to make good the guaranty embodied in that section. The company omitted this sum from taxable income returned for the year 1920. After audit the Commissioner of Internal Revenue added the amount to the petitioner's income and assessed a resulting additional tax, which was paid under protest. Upon rejection of a claim for refund, suit was brought in the Court of Claims to recover the portion of the tax attributable to the inclusion of the guaranty payment, petitioner asserting that the amount received was a subsidy or gift and therefore not income within the Sixteenth Amendment of the Constitution or § 213 of the Revenue Act of 1918.[4] Recovery was denied. This court granted certiorari.

By the terms of § 209 of the Transportation Act railroad companies which, like petitioner, had made contracts with the Director General for annual compensation during federal control, were guaranteed an operating income for the ensuing six months of not less than one-half the amount of such compensation. A minimum operating revenue was also assured to carriers not having such contracts, which had been under federal control or adversely affected thereby. Payment was conditioned on the carrier's acceptance of the provisions of the section, one of which was the agreement that if operating revenue for the period should exceed the guaranteed amount the excess should be paid into the Treasury. Petitioner signified its acceptance.

The statute in terms guarantees a " *minimum operating income* " for six months after relinquishment of federal control. The situation in which the railroads of the country were as a result of war-time Government opera-

---

[4] 40 Stat. 1057, 1065. " That for the purposes of this title . . . the term ' gross income ' . . . (b) Does not include . . . (3) The value of property acquired by gift . . ."

tion is well described in *United States* v. *Guaranty Trust Co.*, 280 U. S. 478, 484. During that period their expenses had risen and there had been no commensurate increase in rates. While the Government had either paid or was obligated to pay just compensation for their requisition, the amount of it was known to be insufficient for rehabilitation of the roads as privately owned and operated organizations. Until rates could be adjusted to meet increased expenses, loans be negotiated, and operating forces realigned and reintegrated, the credit of the carriers must by some means be re-established. Thus the Government had a real obligation, not readily susceptible of accurate measurement, to assist in the restoration of normal conditions. The purpose of the guaranty provision was to stabilize the credit position of the roads by assuring them a minimum operating income. They were bound to operate their properties in order to avail themselves of the Government's proffer. Under the terms of the statute no sum could be received save as a result of operation. If the fruits of the employment of a road's capital and labor should fall below a fixed minimum then the Government agreed to make up the deficiency, and if the income were to exceed that minimum the carrier bound itself to pay the excess into the federal treasury. In the latter event the carrier unquestionably would have been obligated to pay income tax measured by actual earnings; in the former, it ought not to be in a better position than if it had earned the specified minimum. Clearly, then, the amount paid to bring the yield from operation up to the required minimum was as much income from operation as were the railroad's receipts from fares and charges.

The sums received under the act were not subsidies or gifts,—that is, contributions to the capital of the railroads,—and this fact distinguishes cases such as *Edwards* v. *Cuba Railroad Co.*, 268 U. S. 628, where the payments

were conditioned upon construction work performed. Here they were to be measured by a deficiency in operating income, and might be used for the payment of dividends, of operating expenses, of capital charges, or for any other purpose within the corporate authority, just as any other operating revenue might be applied. The Government's payments were not in their nature bounties, but an addition to a depleted operating revenue consequent upon a federal activity.

In a proper sense these payments constituted income to the carrier not exempt from taxation under the Sixteenth Amendment or the Revenue Act of 1918. The Court of Claims was right in denying the claim and the judgment must be

*Affirmed.*