**UNITED STATES**

v.

**MARYLAND JOCKEY CLUB OF BALTIMORE CITY.**

No. 6712.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1954.

Decided Feb. 3, 1954.

Homer R. Miller, Sp. Asst. to Atty. Gen., and Paul C. Wolman, Jr., Asst. U. S. Atty., Baltimore, Md. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Robert N. Anderson, Sp. Assts. to Atty. Gen., and George Cochran Doub, U. S. Atty., Baltimore, Md., on the brief), for appellant.

Richard W. Case, Baltimore, Md. (Lawrence Perin and Semmes, Bowen & Semmes, Baltimore, Md., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

In its income tax return for the fiscal year ending November 30, 1948, The Maryland Jockey Club of Baltimore City (hereinafter called taxpayer) included an item of $75,608.66 as income and paid income taxes of $28,731.29 thereon. This item represented moneys paid by taxpayer into the Maryland Racing Fund and subsequently refunded during the fiscal year in question by the Maryland Racing Commission to the taxpayer. The Commissioner of Internal Revenue denied taxpayer's application for refund. This civil action was then filed to recover the sum of $28,731.29, alleged to have been erroneously paid by taxpayer. The District Judge, sitting without a jury, decided in favor of taxpayer, and there is an appeal to us by the United States. We think the decision below was erroneous. It must, therefore, be reversed.

The taxpayer, which operated a race track (Pimlico) under the supervision of the Maryland State Racing Commission, was required under Maryland law to deduct $\frac{1}{2}$ of 1% from the gross amounts taken in from pari-mutuel betting at its track, which it was required to pay over to the State Racing Commission. These moneys were deposited in a special account known as the "Racing Fund" and, with the permission of the Commission, the taxpayer was entitled to expend them "for any substantial alterations, additions, changes, improvements or repairs to and upon the property owned or leased by such licensee, and by it used for the conduct of racing." If such moneys were not expended, with the approval of the Commission, within three (3) years, the unspent portion reverted to the State "as part of its general funds, and shall be paid over promptly by the Commission to the Comptroller." Section 11A, Chapter 502, Laws of Maryland, 1947; Section 12, Article 78B of the Annotated Code of Maryland, 1951.

After the spring meeting of 1948 held by taxpayer on its race track, which had been damaged by heavy rains, its officers decided to rebuild the racing strip as a substantial addition and improvement to its racing property. On July 28, 1948, taxpayer notified the Maryland Racing Commission that it proposed to rebuild

the racing strip and thereafter and during the fiscal year ended November 30, 1948, was given written and express permission to rebuild the strip. Work on the project was begun and completed before the end of the fiscal year ended November 30, 1948, at a cost of $75,608.66, which was paid by the taxpayer during the fiscal year.

On November 24, 1948, taxpayer forwarded to the Maryland Racing Commission its bills and invoices showing the performance of the work and the furnishing of materials together with the cost thereof in connection with the rebuilding of the strip and the payments made therefor. On November 29, 1948, taxpayer received from the Commission a check for $75,608.66, as reimbursement for the expenditures made in rebuilding the strip. This reimbursement was made out of the funds deducted and deposited by the taxpayer in accordance with the authorization contained in Section 12 of Article 78(B) of the Annotated Code of Maryland, as repealed and reenacted by Chapter 502 of the Acts of 1947.

We are thus called upon to decide whether this $75,608.66 constituted income taxable to taxpayer during the fiscal year in which taxpayer received it from the Racing Commission. Our answer is in the affirmative.

From the opinion of the District Judge in this case, we quote [118 F. Supp. 349, 351]:

"There appears to be no reported decision on facts closely akin to those in the present case. However, we believe that the situation presented in the case of Edwards v. Cuba Railroad Company, 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124, is sufficiently similar to make that decision controlling here. There, money subsidies were granted by the Cuban Government to a railroad company to promote construction of railroads in Cuba; in consideration also of reduced rates to the public as well as reduced rates and other privileges for the Government, these subsidies being fixed and paid proportionately to mileage actually constructed, and were used for capital expenditures by the Company, though not entered on its books as in reduction of cost of construction. This subsidy payment, the Supreme Court held, did not constitute taxable income under the Sixteenth Amendment.

"The gist of the Court's opinion, by Justice Butler, is embodied in the following part of it, 268 U.S. at [pages] 632–633, 45 S.Ct. [614], at page 615, 69 L.Ed. 1124: 'The subsidy payments were proportionate to mileage completed; and this indicates a purpose to reimburse plaintiff for capital expenditures. All— the physical properties and the money subsidies—were given for the same purposes. It cannot reasonably be held that one was contribution to capital assets, and that the other was profit, gain or income. Neither the laws nor the contracts indicate that the money subsidies were to be used for the payment of dividends, interest or anything else properly chargeable to or payable out of earnings or income. The subsidy payments taxed were not made for services rendered or to be rendered. They were not profits or gains from the use or operation of the railroad, and do not constitute income within the meaning of the Sixteenth Amendment.'"

Prior to the decision in the Cuba Railroad case, the Supreme Court had given its classic definition of income under the Sixteenth Amendment in the case of Eisner v. Macomber, 252 U.S. 189, 207, 40 S.Ct. 189, 64 L.Ed. 521, as being the gain derived from capital or labor or both combined provided it be understood to include profit gained through a sale or conversion of capital assets. See Stratton's Independence v. Howbert, 231 U.S. 399, 34 S.Ct. 136, 58 L.Ed. 285; Doyle v. Mitchell Bros. Co., 247 U.S. 179, 185, 38 S.Ct. 467, 62 L.Ed. 1054.

To us, the Cuba Railroad case seems clearly distinguishable from the case before us. In the Cuba Railroad case, the taxpayer operated a railroad in Cuba. Under an Act passed by the Congress of the Republic of Cuba in 1906, the President of the Republic was authorized to contract with one or more companies for the construction and operation of lines of railroad in Cuba, and a subsidy was granted from the Cuban Treasury up to $6,000 per kilometer payable in annual installments to companies constructing and maintaining in use the specified lines. The railroad agreed to reduce by one-third, tariffs in force for the transportation of permanent employees and troops of the Government and in case of war or any disturbance of the public order to transport troops at a certain rate per kilometer and it also agreed to reduce fares for all first class passengers.

In our case, the sum involved was received by taxpayer through the operations of its pari-mutuel betting at its race track. It was allowed to collect the sum, but was required to deposit it in a State Racing Fund to be held for a three year period during which the State could not acquire absolute title, use or enjoyment of the fund. If the fund was needed for permanent capital improvements it could, with the permission of the Racing Commission, be drawn upon by taxpayer. If not drawn within three years it became the property of the State. Until that time the State never acquired absolute title to the Racing Fund involved. It was a fund created and set aside for use of the taxpayer if the need arose, and could not be used by the Racing Commission for any other purpose. The Racing Commission did not collect the sums as a tax. It was not a taxing agency but a regulatory body. Thus, where the fund never vested absolutely in the State as is clearly the fact here, it was never the State's fund for subsidies but represented the taxpayer's own receipts from its own operations, of which it was temporarily deprived of enjoyment but as to which it later realized enjoyment to the extent that the fund was utilized. No track could withdraw from the Fund more than it paid in; no track could use the money paid into the Fund by another track.

We agree with the District Judge that no case, precisely in point with the instant case, has been found. There are, however, a number of cases which are helpful and which tend to show rather clearly the direction in which the tax wind apparently blows.

In Texas & Pacific Ry. Co. v. United States, 286 U.S. 285, 52 S.Ct. 528, 76 L. Ed. 1108, decided subsequent to the Cuba Railroad case, the Supreme Court held that subsidy payments by the United States Government to make up operating deficits of a railroad for the six months' period following the relinquishment of federal control over the railroad were neither gifts nor capital subsidies exempt from taxation but represented taxable income. See, also, Moran v. Lucas, 59 App.D.C. 142, 36 F.2d 546; Hamilton v. Kentucky & I. Terminal R. Co., 6 Cir., 289 F. 20; Houston Belt & Terminal Co. v. United States, 5 Cir., 250 F. 1; Cleveland R. Co. v. Commissioner of Internal Revenue, 6 Cir., 36 F.2d 347.

In Lykes Bros. Steamship Co. v. Commissioner of Internal Revenue, 5 Cir., 126 F.2d 725, it was held that subsidies paid by the Government to a steamship company which were required to be set aside for the purpose of reconditioning taxpayer's boats and the purchase of new boats constituted taxable income notwithstanding this requirement. In Clemmons v. Commissioner of Internal Revenue, 5 Cir., 54 F.2d 209, the court held that a seller of stock for cash realized taxable gain notwithstanding that a portion of the payments was required to be deposited to guarantee performance of an agreement to help finance the construction of a theatre. In Baboquivari Cattle Co. v. Commissioner, 9 Cir., 135 F.2d 114, it was held that subsidies paid by the Agricultural Department for the improvement of land represented taxable income even though they were paid for the express purpose of reimbursing taxpayer for capital improvements. The

Board of Tax Appeals, now the Tax Court, in this case, stated that the doctrine of the Cuba Railroad case has been sparingly applied. 47 B.T.A. 129, 137. In various articles dealing with the doctrine of the Cuba Railroad case the authors have pointed out that the decision is restricted in its scope. See Magill, "Taxable Income," 340–342 (1936); Rottschaefer, "Concept of Income in Federal Taxation," 13 Minn.L.Rev. 637, 669 (1929); Lloyd Fletcher, Jr., "Taxability of the Government Subsidy," 12 Geo.Wash.L.Rev. 245 (1944).

And see, particularly, the opinion of Circuit Judge Parker, speaking for our Court, in Helvering v. Claiborne-Annapolis Ferry Co., 4 Cir., 93 F.2d 875. The taxpayer was a private corporation which operated a ferry across Chesapeake Bay between Annapolis and Claiborne, and Matapeake on the Maryland Eastern Shore. Taxpayer received from the State of Maryland for maintenance of its ferry the sum of $23,000, which was based upon mileage travelled. The amount so received was used for operation of the ferry and was not segregated from other income. We reversed the decision of the Board of Tax Appeals (later the Tax Court) and held that the sum received was taxable income. Judge Parker, 93 F.2d at page 876 said:

> "We think that the amount received by taxpayer from the state was clearly income as distinguished from contribution to capital. It was paid to the taxpayer by the state in consideration of the maintenance of the ferry and was as truly earned by the operation of that enterprise as were the tolls collected from vehicles and passengers."

We are not impressed by the clever and plausible contentions of taxpayer's counsel, which are excursions into the field of juristic semantics. Thus, it is argued that this money was never "earned" by the taxpayer, since the moment a bet was placed, ½ of 1% thereof immediately vested in the Racing Commission. Be that as it may, this money was received and collected by taxpayer as a result of the operation of its track. Federal income taxes are based on reality not form, on fact not fancy, on substance not seeming. See, Bowers v. Kerbaugh-Empire Co., 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886; Irwin v. Gavit, 268 U.S. 161, 166, 45 S.Ct. 475, 69 L.Ed. 897; Roberts v. Commissioner of Internal Revenue, 9 Cir., 176 F.2d 221, 225.

To summarize, we think the moneys here involved were clearly taxable income. They were (a) not derived from the general funds of the State; (b) they were *not* characterized by the State as a subsidy or grant; (c) they were derived from receipts from the taxpayer's business; (d) they were explicitly earmarked and escrowed in a special account; (e) they were not even available to the State of Maryland except after the lapse of three years and even then only if they had not been expended by the taxpayer; (f) they were available to the taxpayer at any time within the three year period, with the permission of the Commission, "for any substantial alterations, additions, changes, improvements or repairs" to its property used for the conduct of racing; and (g) finally, they were actually received by the taxpayer in reimbursement for such expenditures. We are led to believe that little or no money placed in the Racing Fund has ever reverted to the State of Maryland.

Equally clearly we think this income was taxable during the fiscal year in which it was made available to taxpayer. In Mutual Telephone Co. v. United States, 9 Cir., 204 F.2d 160, it was held that a telephone company's receipts from increased installations and new supersedure charges authorized by the Utility Commission's order which required that the receipts be charged to a certain account and not taken into taxpayer's income account until the Commission authorized such action, did not constitute taxable income for years prior to their actual credit to the taxpayer by the Commission's authority but represented income in the latter year. Cf. United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560; North American Oil

Consolidated v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 76 L.Ed. 1197; Standard Slag Co. v. Commissioner of Internal Revenue, 62 App.D.C. 8, 63 F.2d 820.

The judgment of the District Court is reversed and the case is remanded to that Court with directions to enter judgment in favor of the United States.

Reversed.